IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No.: 2:07-cr-104-WKW |
| | ) | (WO) |
| NORMAN EVANS McELROY, JR. | ) | |

RECOMMENDATION OF THE MAGISTRATE JUDGE

This case is before the court on defendant's motion to suppress (Doc. #26) and the

government's response (Doc. # 39). The court held a hearing on the motion on February 13,

2008. For the reasons set out below, the motion is due to be denied.

Facts

In August 2006, FBI special agent Tim Miller began investigating defendant McElroy

for possible possession of child pornography. McElroy had been identified to Miller by the

National Center for Missing and Exploited Children as an individual who was possibly

accessing child pornography websites. In the course of his investigation, Miller showed

McElroy's driver's license photograph to Miller's training agent, FBI agent Keith Baker.

Baker noticed a resemblance between the man in the photograph and a computer-generated

composite picture of a suspect in an unsolved case that he had worked on in 2001, which

involved the abduction and murder of S.P., a 12-year-old female. Baker also noticed that the

address on McElroy's previous driver's license, which had expired in 2006, was a street in

the Candlestick Trailer Park in Prattville, Alabama, the neighborhood in which S.P. had

resided.

1

Baker and Miller decided to visit McElroy's former girlfriend, Melanie Osborne, to show her the composite photograph in the S.P. case. During that visit, in March 2007, Osborne told the agents that McElroy was living with another girlfriend with the last name of Tatkenhorst on Rifle Range Road, and said that McElroy might be driving a red pickup truck. Baker located an address for Tatkenhorst on Rifle Range Road, and when the agents drove by that address they saw a red pickup truck parked in the driveway.

Thereafter, on March 30, 2007, five agents, including Baker and Miller, went to the Tatkenhorst residence in plain clothes to attempt to interview McElroy. Special Agents Miller and Murray approached the door. A few seconds after they knocked, McElroy appeared at the door and accompanied the agents outside the residence and away from the front of the house toward Agent Miller's car. Two other agents, Baker and LaCarter, then went to the door, knocked, identified themselves, and asked Tatkenhorst whether they could come in and speak to her about pornography that could possibly be on her computer. Tatkenhorst invited the agents inside. According to Baker, Tatkenhorst was upset at the possibility that pornography might be on the computer, as she knew that her minor son might have accessed some pornography websites previously, and her former husband had also had a problem with pornography. Tatkenhorst told the agents that the computer in question belonged to McElroy, but said that she had free access to it and that she could use the computer at any time.

The agents told Tatkenhorst that they had a program that could scan the computer's hard drive and identify pictures without altering the hard drive. Tatkenhorst gave the officers

oral and written permission to conduct the scan, and also gave them the computer password. Agent Christopher LaCarter then went outside and read the consent form to McElroy, and explained that the agents wanted to search the computer and that they were looking for child pornography. McElroy also signed the consent form and, at some point, made some self-incriminating statements to Miller concerning uploading child pornography. LaCarter went back inside the residence, and began the image scan of the computer. Ten to eleven minutes after the agents began the scan, they saw images that appeared to represent child pornography. They continued the scan for some period in which more such images appeared, then shut the computer down to be seized. Because the agents were unable to copy images from the computer to their thumb drive, Miller asked McElroy whether they could search the computer offsite. McElroy said that was fine, that they could do what they needed to do, and he signed the property receipt for the computer.

## Discussion

<u>Statements by Defendant</u>

1.    *Defendant's statements at his home*.

Defendant McElroy made a number of incriminating statements to agents while they were at his home. He said, *inter alia*, in response to questions by Agent Miller, that he remembered being a member of the Yahoo user group mentioned by Miller and that he recalled uploading three of the redacted images that had been sent in on the original complaint. He also said that the last time he had viewed child pornography was the day before the interview, and that he did have child pornography on his computer in his My

3

Music folder.  Defendant admitted to using file sharing programs to obtain the child pornography, including Line Wire and Bear Share.

McElroy now contends that he was in custody at the time that agents spoke with him at his home, at the FBI headquarters, and in the car after he was arrested and, therefore, agents should have given him Miranda warnings before asking any questions designed to elicit incriminating information. "The right to Miranda warnings attaches when custodial interrogation begins." United States v. Acosta, 363 F.3d 1141, 1148 (11th Cir. 2004).  As the Acosta Court noted, "[n]ormally courts apply a two-part test to determine whether a suspect is in custody for Miranda purposes: 'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'" Id. (citing Thompson v. Keohane, 516 U.S. 99, 112 (1995)); see also Peoples v. Campbell, 377 F.3d 1208, 1228 (11th Cir. 2004).

In this case, after identifying himself, Agent Miller told McElroy that there was a very private matter that he wanted to discuss with him, that it was sensitive in nature, and that the agents were conducting an investigation.  For privacy, he asked McElroy to come into the front yard.  According to Miller, McElroy said that he would be more than happy to talk to him and voluntarily came out of the house for that purpose.  McElroy was concerned that he was under arrest, and Miller specifically told him that he was not under arrest.  Miller then told McElroy that they were investigating the S.P. murder, explained that he had "come up on the radar" because he had resided at Cub's place, and indicated that he was trying to find

out exactly when McElroy had lived there, whether he had any reason to be in that subdivision at the time of the murder, and whether he had been interviewed at the time. According to Miller, McElroy was "extremely cooperative. We were almost on a first-name basis very early in the conversation." Miller also told McElroy about the child pornography complaint, and asked him further questions which led to McElroy's self-incriminating admissions.

The court cannot conclude under these circumstance that Miranda warnings were required. Although five agents were present at the scene, only Miller and Murray asked defendant questions, other than LaCarter's request for consent to search the computer. The agents were in plain clothes, their weapons were not brandished, no physical force or threats were used against the defendant, he was not told that he was under arrest, and he was not restrained in any way. In addition, defendant was questioned at his own home, and "'courts are *much* less *likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home.'" United States v. Gomes, WL 2212000, 7 (11th Cir. 2008) (emphasis in original) (citations omitted). The fact that agents communicated their suspicions that McElroy may have had a role in the S.P. matter and that he might possess child pornography is relevant to the court's inquiry but not dispositive. As the 11th Circuit noted recently, "[t]he Supreme Court has stated that an officer's suspicions regarding a suspect 'may bear upon the custody issue if they are conveyed' to the suspect, however, '[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for

5

some suspects are free to come and go until the police decide to make an arrest.'" <u>Id</u>. (citing <u>Stansbury v. California</u>, 511 U.S. 318, 325 (1994)); <u>see also</u> <u>Gomes</u>, WL 2212000, 8 ("While the officers did say that they suspected Gomes of having child pornography on his computer, an officer's articulated suspicions are not dispositive of the inquiry."). Here, there is no indication that McElroy thought that he was in imminent danger of being arrested on any charge if he sought to terminate the interview or re-enter his home. Indeed, not only was he expressly informed by agents that he was not under arrest, he was not in fact arrested even when the agents found child pornography on his computer. Thus, the court concludes that the agents' stated suspicions did not render their interview with McElroy custodial. <u>Miranda</u> warnings were not required in this case.[1]

2. *Defendant's Statements at the FBI conference room.*

On April 9, Miller called McElroy to see if he would come by for a DNA sample and a follow-up interview. Mc Elroy replied that he had a lunch break free on April 10 and he would be happy to come by and talk with them then. He arrived at FBI headquarters at approximately 12:30. Miller showed him the rest room outside the FBI suite and asked him if he wanted something to drink. McElroy requested a Diet Coke, and Agent Murray brought him the drink. Miller, Murray and McElroy went into a conference room and sat down, and

---

[1] The court further finds without merit defendant's contention that agents falsely claimed that they were investigating him in connection with the S.P. murder in order to coerce his cooperation. The court credits the testimony of the agents that they believed in good faith that McElroy could have been involved in this incident based on his resemblance to the composite drawing, evidence of his involvement with child pornography, and his former connection to the area in which S.P. was a resident.

Miller told McElroy that he was free to go at any time, and he could go back to work if he needed to – "just to take off." They left the door open and Miller explained that this was a completely voluntary interview. McElroy sat in the chair closest to the open door leading out of the conference room into the hallway. Miller and Murray sat across the table.

Miller asked if McElroy would consent to giving a DNA sample. McElroy said that he was more than happy to cooperate in any way with the investigation, and that he had absolutely nothing to do with S.P.'s disappearance (which proved to be the case). He signed a consent to search form for a DNA sample and, after the sample had been taken, Miller asked if McElroy would talk to them a little more about the child pornography complaint, the images that had been sent to them, and the file sharing process. McElroy made further incriminating statements concerning uploading child pornography. Miller then asked if he were willing to write up a statement, and told him that this would be completely voluntary on his part. According to Miller, McElroy was "extremely cooperative" and "very helpful." After McElroy finished writing the statement he reviewed it and then signed it. The agents thanked him for coming in, walked him to the door and shook his hand. Again, according to Miller, McElroy was "an extremely cordial individual, very nice and very helpful."

Applying the two-part test used to determine whether a suspect is in custody for Miranda purposes, it is clear that McElroy was not in custody during this meeting. McElroy voluntarily agreed to meet with agents, chose the day and time himself, and drove himself to the interview. He was expressly informed that the interview and written statement were completely voluntary and that he was free to go at any time. Nothing in the record suggests

7

that the agents showed or brandished their weapons and, again, no physical force or threats were used against the defendant, he was not told that he was under arrest, and he was not restrained in any way. In addition, Tatkenhorst testified that McElroy told her that he went to the FBI office voluntarily. Under the totality of these circumstances, a reasonable person would have felt he or she was at liberty to terminate the interrogation and leave, and Miranda warnings were not required.

3.  *Defendant's statement after his arrest.*

Later on, three agents arrested McElroy on a complaint and warrant at his place of employment.  After getting in the car,  McElroy asked Agent Miller what was going on, and Miller told him that it was in his best interest to remain silent and that an attorney would be provided to him, or words to that effect.  They rode for a while, and then McElroy commented, "Well, I did something wrong, and I'm going to have to pay the price.  I understand you guys are just doing your job." McElroy was not read his Miranda rights before he made this statement.

"Voluntary and spontaneous comments by an accused, even after Miranda rights are asserted, are admissible evidence if the comments were not made in response to government questioning." Cannady v. Dugger, 931 F.2d 752, 754 (11th Cir.1991); see also United States v. Johnson, 136 Fed.Appx. 279, 283 (11th Cir. 2005).  Absent any evidence that McElroy's alleged statement was the product of interrogation, testimony concerning the statement is not due to be suppressed.  See United States v. Washington, 431 U.S. 181, 187 (1977) ("Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not

coerced, are inherently desirable. ... Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions.").

Consent to search computer

Defendant contends that FBI agents used software on his computer without his consent to download and review the contents of his hard drive.[2]  However, the court finds that agents obtained McElroy's voluntary consent to search his computer both at his residence and off site.  "A consensual search is constitutional if it is voluntary; if it is the product of an essentially free and unconstrained choice." Acosta, 363 F.3d at 1151 (citations and internal quotation marks omitted). "Voluntariness is a question of fact based on the totality of the circumstances." Id. "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." Id. (citations and internal quotation marks omitted).

"In assessing voluntariness, the inquiry is factual and depends on the totality of the circumstances.... In evaluating the totality of the circumstances underlying consent, the court should look at several indicators, including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found." United States v. Simms, 385 F.3d 1347, 1355

---

[2]  Actually, the FBI conducted an image scan, and did not download anything at the time of the initial search.

(citations and internal quotation marks omitted).

The court has before it no evidence concerning defendant's awareness of his right to refuse consent or his education so it cannot evaluate these indicators. Agent Christopher LaCarter explained to McElroy that the agents wanted to search the computer and that they were looking for child pornography. Based on his statements to agents, it appears that McElroy was aware that incriminating evidence would be found on the computer. Nevertheless, he was extremely cooperative with agents, and he signed the consent form without protest. As noted above, because the agents were unable to copy images from the computer to their thumb drive, Miller later asked McElroy whether they could search the computer offsite. McElroy said that was fine, that they could do what they needed to do, and he was more than happy to cooperate. Defendant's acquiescence to these procedures appears to the court to have been voluntary and unconditional, not coerced.

## Conclusion

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that the motion to suppress be DENIED. It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before August 1, 2008. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court.

Failure to file written objections to the proposed findings and recommendations in the

Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  Nettles v. Wainwright, 677 F.2d 404 (5th Cir. 1982).  See Stein v. Reynolds Securities, Inc., 667 F.2d 33 (11th Cir. 1982).  See also Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981, en banc), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE, this 24th day of July, 2008.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE